# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF:

JEROME C. GRAY,

     Plaintiff,

                              C.A. No. 06-01265(TFH)

v.

DISTRICT OF COLUMBIA,
et al.,

     Defendants.

Tuesday
October 23, 2007

Washington, D.C.

DEPOSITION OF:

**JEROME C. GRAY**

called for examination by counsel for the
Defendants, pursuant to notice of deposition,
in the Office of the Attorney General,
Conference Room 6N106, 441 Forth Street, NW
when were present on behalf of the respective
parties:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433       WASHINGTON, D.C.  20005-3701     www.nealrgross.com

APPEARANCES:

    On Behalf of the Plaintiff:

        GREGORY L. LATTIMER, ESQ.
        Law Offices of Gregory L. Lattimer
        1100 H Street, N.W.
        Suite 920
        Washington, D.C.  20005
        (202) 638-0095

    On Behalf of the Defendant:

        LETICIA VALDES, ESQ.
        Assistant Attorney General
        ZUBERA WILLIAMS, ESQ.
        Assistant Attorney General
        PATRICIA JONES, ESQ.
        Section Chief, Section IV
        Office of the Attorney General
        441 Forth Street, N.W.
        Sixth Floor
        Washington, D.C.  20001
        (202) 442-9845 - Ms. Valdes
        (202) 724-6650 - Mr. Williams
        (202) 724-6529 - Ms. Jones

1          Q     Okay.    What    is    your    current

2     address, Mr. Gray?

3          A     2806 26th Street, NE, Washington,

4     DC 20018.

5          Q     And how long have you been living

6     there?

7          A     Since 1973.

8          Q     Where did you live before that?

9          A     I lived at 3103 Good Hope Road,

10    Hillcrest Heights.

11         Q     Do you own your current home?

12         A     Yes, I do.

13         Q     How long have you owned your home?

14         A     Since 1973.

15         Q     Who do you live there with?

16         A     A friend.

17         Q     And what is this friend's name?

18         A     Brenda Sayles.

19         Q     Is Brenda Sayles a witness in this

20    case?

21         A     Yes.

22         Q     Okay.    What is your relationship

1   with Ms. Sayles?

2          A    Friends.

3          Q    So she is just a roommate or is

4   there any romantic relationship between you

5   and Ms. Sayles?

6          A    She's my girlfriend.

7          Q    Okay, she's your girlfriend.   How

8   long have you been living with her?

9          A    She's been living with me,

10   approximately, since probably '83.

11          Q    Is that around the same time that

12   your relationship with Ms. Sayles began?

13          A    A little bit before that.   It

14   really began when we were high school

15   graduates also.

16          Q    Okay.   So you've known her for a

17   longer period of time, more than 1983?

18          A    Yes.

19          Q    Okay.   Anybody else live at the

20   home with you?

21          A    No, ma'am.

22          Q    Mr. Gray, what is your educational

1    background?

2        A    Pardon me.

3        Q    Your educational background?

4        A    Two years -- a year and a half of

5    college.

6        Q    What did you study in college

7    during those --

8        A    Physical education.

9        Q    Anything else -- have you obtained

10   any certificates or any other licensing after

11   college?

12       A    No.

13       Q    Okay.  Where did you graduate from

14   high school?

15       A    Eastern High School, Washington,

16   DC.

17       Q    And where did you complete the two

18   years of college?

19       A    Bowie State College?

20       Q    Is that in Maryland?

21       A    Yes, that's correct.

22       Q    Are you currently employed?

1          A      No, ma'am.

2          Q      When was the last time you were

3    employed?

4          A      1994.

5          Q      And who were you employed with?

6          A      Metropolitan Police Department as

7    a sergeant.

8          Q      And did you retire with the

9    Metropolitan Police Department?

10         A      Yes, ma'am.  After 26 years.

11         Q      Did you work anywhere else before

12   working for the police department?

13         A      Yes, ma'am.

14         Q      What was your -- what were your

15   duties for the police department at the time

16   of your retirement?

17         A      I was a vendor coordinator for the

18   Metropolitan Police Department.

19         Q      And what is a vendor coordinator?

20         A      I was responsible for enforcing

21   the vending regulation throughout the District

22   of Columbia.  Any public space complain and I

1       Q    Do you or a business that you are

2    an officer or owner of, currently hold any

3    vending licenses in the District of Columbia?

4       A    No, ma'am.

5       Q    Have you ever had a vending

6    license in the District of Columbia?

7       A    No, ma'am.

8       Q    Okay.  So everything you know

9    about vending licenses in the District of

10    Columbia, that knowledge you acquired either

11    as a police officer or subsequently in your

12    research or whatever it is?

13       A    That's correct.

14       Q    Okay.  Mr. Gray have you ever had

15    any counseling or treatment for mental or

16    emotional disturbances?

17       A    No, ma'am.

18       Q    Since this incident that we're

19    here for today, have you ever had any

20    counseling or treatment or seen a psychiatrist

21    or anything of that sort?

22       A    No, ma'am.

1      Q     Let me be less specific now, since

2   the incident that we are here for today, have

3   you seen any doctors or any physician of any

4   sort for any injuries that you may have

5   incurred as a result of the incident that we

6   are here for today?

7      A     No, ma'am.

8      Q     Do you know who Brenda Sayles is?

9      A     Yes, ma'am.

10     Q     Okay, and who is Brenda Sayles?

11     A     That's my girlfriend.

12     Q     Okay.   That's the person that

13  lives with you?

14     A     Yes.

15     Q     And that's the person you first

16  met sometime in 1986, is that correct?   '83?

17  '86? A     1990 -- 1960's.

18     Q     Okay.  When was the last time that

19  you spoke to Ms. Sayles about this case --

20  have you spoken to her at all about this case?

21     A     Yes.

22     Q     Okay.  When was the last time that

1      A    No, ma'am.

2      Q    She was not?

3      A    No, ma'am.

4      Q    Was she in that area with you?

5      A    Yes, ma'am.

6      Q    Okay.  What were you doing there

7  at the time?

8      A    Ms. Ann Young had called Ms.

9  Brenda Sayles stating that the police was

10  harassing them in front of the Armory during

11  the Nationals' games.

12      Q    Okay.  Is Ms. Young in anyway

13  related to Ms. Sayles?

14      A    No, ma'am.

15      Q    Okay.  How do they know each

16  other?

17      A    By being vendors.

18      Q    Okay.  Does Ms. Young visit your

19  home at any time?

20      A    No, ma'am.

21      Q    Okay.  Is she someone that you

22  socialize with, go out to dinner, parties?

1    in that day, sometime that day before we went

2    over there, but also my understanding is that

3    apparently the harassment occurred prior to

4    that day.

5            Q      Okay.   Why don't we ask this

6    question, on the day of the incident that

7    you're here for today, you were at the DC

8    Armory, is that correct?

9            A      Pardon me.

10           Q      You were at the DC Armory, in

11   front of the DC Armory?

12           A      On what day?

13           Q      On the day of the incident that we

14   are here for.

15           A      Yes, that's correct.

16           Q      Why were you there?

17           A      I took Ms. Sayles over to the

18   Armory to see Ms. Young.

19           Q      Okay, and why was Ms. Sayles going

20   over there to see Ms. Young?

21           A      Because of the harassment by the

22   police department.

1       Q    Okay.

2       A    And I put my trash in the trash

3  receptacle.

4       Q    Okay.

5       A    There was an officer that was

6  standing between, in the grass area, between

7  the major roadway and the service roadway

8  lane, and I said, "What they got you doing?"

9  He said, "I'm watching to make sure the

10  pedestrians don't walk in the street."

11       Q    Do you know the name of that

12  police officer as you sit here today?

13       A    Yes, Officer Roots.  R-O-O-T-S.

14  Assigned to the Seventh District.

15       Q    Okay.    And thereafter, what

16  happened?

17       A    I was just there by myself.

18       Q    Okay.

19       A    Sitting on the barricade.    The

20  Jersey barricade, which the Armory has put up

21  there since 9/11.

22           Ms. Young saw the officer we know

1    as Sergeant Lawrence, parked his car.  They

2    met in front of me.  I didn't have to move.

3    And Ms. Young asked the sergeant why couldn't

4    they sell the hats with the W on it.

5         Q    Okay, let me clarify.  You were

6    standing near another police officer --

7         A    No, ma'am.

8         Q    You were not?

9         A    No, ma'am.

10        Q    At that point you were not close

11   to  the other police officer anymore?

12        A    I was at least thirty feet away

13   for him.  I yelled to him and said, "Hey man,

14   what's your assignment today?"

15        Q    Okay.  Where did Sergeant Lawrence

16   park his vehicle?

17        A    Right in front of the Armory, in

18   the service road lane, the outer service road

19   lane.  In other words, on the other side of

20   the barricade, the Jersey barricade.

21        Q    Okay.  How close was his vehicle

22   to you?

1      A      The vehicle was pretty much within

2   five feet of me.

3      Q      Okay.  And then, Ms. Young come

4   towards Sergeant Lawrence, is that correct?

5      A      That's correct.

6      Q      Then Ms. Sayles comes towards

7   Sergeant Lawrence?

8      A      Later she came, and then another

9   vendor came.

10      Q      Okay, so let's start with when Ms.

11   Young came over to Sergeant Lawrence.  At that

12   point it was just Sergeant Lawrence and ms.

13   Young?

14      A      And me.

15      Q      And you.

16      A      Because they were in my space.

17      Q      Okay.

18      A      They were right in front of me.

19      Q      Okay.

20      A      I didn't have to move left or

21   right.  They met in front of me.

22      Q      Okay, so what happened?

1        A      Ms. Young asked Sergeant Lawrence,

2    who they identified as Sergeant Lawrence, why

3    couldn't they sell the hats with the W on it.

4        Q      Okay.

5        A      And he said that you couldn't sell

6    it unless it had an official tag on it.

7        Q      Okay, and then what happened?

8        A      Then he said if I catch anybody

9    selling hats without the official seal on it,

10   then he was going to take that merchandise and

11   confiscate it and put them under arrest.

12       Q      Okay.

13       A      And I told the sergeant, I said,

14   "Sir, that's not correct."   I said several

15   years ago when the Redskins were here, that

16   they tried to copyright the cursive W, and I

17   also said, since we just got finished with the

18   inauguration, I said everybody would ask for

19   the hats with the W on them.

20       Q      Okay.

21       A      Okay.

22       Q      And then what happened?

1    A    Then he asked me who I was.

2    Q    Okay, and what did you tell him?

3    A    I told him I was a citizen voicing

4    my First Amendment right, freedom of speech.

5    Q    Okay.  Did you identify yourself

6    at any point as a retired police officer?

7    A    No, ma'am.

8    Q    Were you carrying a gun with you

9    at that time?

10    A    Yes, ma'am.

11    Q    Did you tell this police officer,

12    at any time -- right in this moment that we're

13    in, that you had a gun with you?

14    A    No, ma'am.

15    MR. LATTIMER:    Objection as to

16    relevance and materiality.

17    MS. VALDES:  Okay, go ahead.

18    THE WITNESS:  No, ma'am.

19    BY MS. VALDES:

20    Q    Okay, so you told the police

21    officer that that was incorrect, were you

22    speaking to him in the same tone of voice that

1    you are speaking to me now?

2        A    Yes, ma'am.  I --

3        Q    You were not --

4        A    Yes, ma'am.

5        Q    Okay.  Then what happened?

6        A    Then he was say that this is

7    private property in front of the Armory, and

8    that you cannot sell that product there, you

9    have to go up on the other side, 18th Street,

10   to sell it.

11       Q    Okay, so he was telling you that

12   or he was telling Ms. Young that?

13       A    He was telling the people that

14   were in the group and I was one of the --

15       Q    Wait a minute.  The people that

16   were in the group, up until now you had only

17   told me that Ms. Young had gotten there.  Who

18   else was there?

19       A    Ms. Young was there, Ms. Brenda

20   Sayles, another vendor helper, I can't think

21   of her name, and a guy named Steve.  He helped

22   the vendors, too.  Four of them were there at

1            Go ahead, Mr. Gray.

2            THE WITNESS:  Could you repeat the

3    question, ma'am?

4            BY MS. VALDES:

5        Q    The question was do you remember

6    if he had a beard or a mustache, or anything

7    else?

8        A    I don't recall.

9        Q    Okay.  Okay, so there were two

10   police officers there, Sergeant Lawrence, you,

11   Ms. Young, Ms. Sayles, and who else -- Steve

12   the helper?

13       A    Yes.

14       Q    And who else?

15       A    Brenda Sayles was there.

16       Q    Okay.

17       A    And another female vendor that

18   helped Ms. Pat Mudd.

19       Q    Was Ms. Pat Mudd also there?

20       A    She came a few minutes later.

21       Q    Okay, so Ms. Pat Mudd also,

22   eventually, joined the group?

1          A      That's correct.

2          Q      And I was asking you who was
3    saying anything at the time and I think you
4    were mentioning that there were some people
5    say stuff.  Do you remember who was saying
6    anything at the time?

7          A      Well, Sergeant Lawrence was saying
8    that, like I said before, that in front of the
9    Armory it was private property.

10         Q      Okay.

11         A      And that they could not sell that
12   merchandise in front of the Armory because it
13   was private property.  They had to go up on
14   the side, 18th Street and East Capitol, to
15   sell those items.

16         Q      Okay.

17         A      I said, "Sir, that's not correct."
18   These are licensed vendors and these are
19   licensed spaces.

20         Q      Okay, and the n he responded, he
21   asked you who you were and you said?

22         A      I said that I was a citizen

1    exercising my First Amendment right, freedom

2    of speech.

3        Q    And then what happened?

4        A    Then he told me I had to leave

5    this area, and I said, "Sir, I haven't

6    violated any laws, I'm just he voicing my

7    opinion."

8        Q    And then what happened?

9        A    And then, about that time Ms.

10   Sayles and Ms. Young left, and the

11   representatives from Consumer Regulatory

12   Affairs was probably a hundred feet down.

13   They went to get them because the officer said

14   that they had to leave the area.

15       Q    Okay.

16       A    And again, I just told the

17   sergeant, I said, "That is not correct." At

18   no time did I raise my voice.  I was talking

19   to them very politely.  I gave them all the

20   respect in the world.

21       Q    Okay.  And then what happened?

22       A    And then I decided -- I was

1      leaning against the Jersey barricade with my

2      hand folded and I said to myself, this

3      sergeant is out of control.  He does not know

4      the vending regulation.  So I stood up from

5      the wall, looked the sergeant straight in the

6      eye, I said, "Sir, am I under arrest?"

7           Q    Okay, you said, "I just told

8      myself."  Were you thinking that or did you

9      actually say that out loud?

10          A    I was thinking to myself.

11          Q    You were thinking that, okay.

12          A    Okay.  That he was out of control

13     and that he does not know the vending

14     regulation.

15          Q    Okay.

16          A    And I stood up from the wall, and

17     I said, "Sir, am I under arrest?"

18          Q    And then what happened?

19          A    He didn't say anything.    I

20     proceeded to turn right to walk away from him,

21     because to this time I just know that this

22     sergeant was not, you know, correct about what

1    he was doing.  I walked -- I turned away from

2    him after he didn't -- I gave him time.  I

3    gave him a chance to answer.  I looked him

4    dead in the eye, I said, "Sir, am I under

5    arrest?"  He didn't say nothing.

6            I proceeded to my right to walk

7    away.   He  threw  me  against  the  Jersey

8    barricade, put the handcuffs on me.  I didn't

9    resist, and the first thing he said out of his

10   mouth is that "Now I'll find out who you are."

11   I responded, I said, "Sir, why are you placing

12   me under arrest?"   "You're interfering with

13   our investigation."  And I said, "Sir, what

14   investigation?"

15       Q     How   many   times   did   Officer

16   Lawrence ask you to leave the area?

17       A     One time.

18       Q     Okay.  And why did you not comply?

19       A     Because  I  did  not  do  anything

20   wrong.   I  did  not  violate  any  laws  or

21   regulations.  I was in front of the Armory.

22   I was not in an area of high drug or high

1   an area where you were conducting -- where you

2   were talking to other citizens, did you ever

3   ask anyone to leave the area?

4                MR. LATTIMER:    Objection  as  to

5   relevance and materiality.

6                THE WITNESS:  No, ma'am.

7                BY MS. VALDES:

8         Q     You never did?

9         A     No.

10        Q     In your 26 years, you never did?

11        A     That's correct.

12        Q     Okay,  and  I  guess  --  let's  move

13   forward.  So, basically, at that point, did

14   you tell, at any time, Officer Lawrence, that

15   you were a retired police officer?

16        A     No, ma'am.

17        Q     You did not.  And at any time, did

18   you tell him that you had a gun with you?

19        A     No, ma'am.

20        Q     You did not?

21        A     No, ma'am.

22        Q     And why not?

1    talking   to   the   DC   Consumer   Regulatory

2    inspectors, and they were all -- all of them

3    were walking towards me.

4         Q    Okay.   What happened after your

5    arrest?

6         A    I was transported to the Sixth

7    District Police Station by an officer from the

8    Fifth District.

9         Q    Okay, and then what happened?

10        A    When I got to the Sixth District,

11   I told the officers that -- I just came in and

12   I said I would like to pay my collateral and

13   get a court date.  And he --

14        Q    And what happened?

15        A    -- stated that "Oh, I heard you

16   and the Sergeant got in a pistol match."  And

17   I said I didn't get in a pistol match with

18   him.

19        Q    Who was this person that you spoke

20   to?

21        A    It was one of the officers that's

22   in the station.

1    names, that came back and showed me a form

2    whereby I could pay my collateral, within 60

3    days go down to this office, the Attorney

4    General of the District of Columbia, and have

5    my forfeit set aside.

6         Q    Okay.

7         A    And that's what I ended up doing.

8         Q    Okay, but I'm confused.  You said

9    that they refused to allow you to pay the

10   collateral, but then you're saying that they

11   did let you pay the collateral, so which one

12   is it?

13        A    They did not want to take my

14   collateral initially.  They wanted me to stay

15   there and either pay my collateral or go to

16   court, to Central Cell Block to appear in

17   court the next day as a lock-up case.

18        Q    Okay.  Was Sergeant Lawrence one

19   of the officers that refused to allow you to

20   pay the collateral?

21        A    I would say, well, no.

22        Q    Okay.  Was it Officer Falwell?

1      A     She was in charge of the station

2   at that time, yes.

3      Q     Okay.     Did you speak to her

4   directly?

5      A     I spoke to her.    She around, I

6   guess at the changing of the shifts because

7   she wasn't initially there when I came around

8   about 7:30.

9      Q     So you got there around 7:30 is

10   what you said?

11      A     That's correct.     Around about

12   approximately 7:30 that night.

13      Q     Okay.

14      A     And approximately nine o'clock,

15   nine or ten when they change the shift, she

16   came back to the cell block and said, "Can you

17   walk?"  I said, "Yes, I can walk."  "Do you

18   want to go to court?"  I said, "I'd like to

19   pay my collateral and get a court date."  "You

20   don't tell us what you want done."   And I

21   said, well, ma'am, also I never been arrested

22   before so I'm eligible for citation.    "Well

1    you don't tell us what you want us to do."

2    And that was that.

3        Q    Okay.

4        A    Sergeant Lawrence came back to the

5    cell block three different times.  The first

6    time he asked me who did I want to notify.  I

7    told him that, don't worry about me, somebody

8    was already there to, you know, notified.  He

9    came back again and said, who do you want us

10   to notify.  So I told him, I said, I would

11   like for you to notify former Councilmember

12   Douglas Moore,  former Councilmember Nadine

13   Winters, Catania, and Graham, because I know

14   them personally.  That's what I told him.

15       Then he left and came back a third time

16   and he said why didn't you tell me that you

17   were a police officer.  And I said, why should

18   I.   I didn't do anything wrong.   I was

19   speaking  for  my  rights  as  a  citizen.

20   Secondly, after you found out who I was you

21   could have released me from the scene,  or

22   after three hours after I came to the precinct

1     Q     And what was the telephone number?

2     A     202 --

3     Q     Okay.

4     A     -- 236-8269.

5     Q     Did you also have a land line at

6     your home at that time?

7     A     Yes.

8     Q     Is that cell phone number that you

9     just gave me just your cell phone, or is it

10    also the cell phone of Ms. Sayles?

11    A     It's just my cell phone.

12    Q     It's just your personal cell

13    phone?

14    A     That's correct.

15    Q     Okay.  Does she also have a cell

16    phone?

17    A     Yes, she does.

18    Q     Okay, and did she have one at the

19    time of the incident?

20    A     Yes, ma'am.

21    Q     Was Officer Falwell present during

22    the arrest?

1        A      No, ma'am.

2        Q      She was not?  At any time during

3   this whole incident did she touch you in

4   anyway?

5        A      No, ma'am.

6        Q      Okay.  Did any officer hit you at

7   any time during this incident?

8        A      One pushed me, but not hit.

9        Q      Okay.  When you say one, was it

10  Officer Lawrence?

11       A      No.

12       Q      Was it Officer Falwell?

13       A      No, ma'am.

14       Q      Do you recall --

15       A      One was the arresting officer, the

16  tall one that was -- initially came up with

17  Sergeant Lawrence.

18       Q      When you describe the female and

19  the male --

20       A      That's correct.

21       Q      -- the original female and male?

22  Okay.  What injuries, if any, did you sustain

1    it and that type of relationship.

2        Q    And --

3        A    Because I think that the vendors

4    have a right to work, you know.  Everybody

5    cannot be lawyers or doctors, etcetera.  So,

6    therefore, if there's people that want to work

7    for themselves, I think the government should

8    provide certain things for them.  And that's

9    my personal opinion.

10       Q    Okay.  Anything else that you do

11   for the vendors?

12       A    No.

13       Q    Now the date of the incident that

14   we're here for today, there was an event going

15   on at RFK Stadium and I think it was a

16   baseball game.  Were you there to attend the

17   game?

18       A    No, ma'am.

19       Q    Okay.  You were just there because

20   you had given a ride to Ms. Sayles?

21       A    That's correct.

22       Q    At the station, on the day of the

1    incident, you mentioned that you spoke to

2    Officer Falwell a couple of times.  That she

3    came to talk to you and she made a couple of

4    comments to you.  Other than talking to you,

5    what else did she do at the station?

6         A     Nothing.

7         Q     Okay.  When you were the vendor

8    coordinator for the District of Columbia, did

9    you provide any training, you yourself, to the

10   police officers that were working in your

11   unit?

12        A     No, ma'am.

13        Q     You did not?

14        A     No.

15        Q     Let me ask you a question about

16   the gathering of the vendors when they were

17   talking to Sergeant Lawrence on the day of the

18   incident.  You mentioned that Ann Young and

19   Ms. Sayles were talking to him, they came to

20   talk to him.  He parked him vehicle and they

21   sort of walked almost, very near where you

22   were and Ms. Young and Ms. Sayles came to talk

# Exhibit 2

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

1 (Pages 1 to 4)

---

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3     - - - - - - - - - - - - - - - - x
4    JEROME GRAY,
5            Plaintiff
6        v.           CA No. 06-01265 (THF)
7    THE DISTRICT OF COLUMBIA, et al.,
8            Defendants
9     - - - - - - - - - - - - - - - - x
10        Deposition of SERGEANT NACEL A. LAWRENCE
11            Washington, D. C.
12          Thursday, October 18, 2007
13              10:12 a.m.
14
15    Job No. 1-114550
16    Pages 1 - 102
17    Reported By:  Cindy L. Wilmoth, RPR
18
19
20
21
22

---

**Page 2**

1        Deposition of SERGEANT NACEL A. LAWRENCE
2    held at the offices of:
3
4        Law Offices of Gregory L. Lattimer
5        Suite 920
6        1100 H Street, Northwest
7        Washington, D. C.  20005
8        (202) 638-0095
9
10
11
12
13        Pursuant to agreement, before
14    Cindy L. Wilmoth, Registered Professional Reporter and
15    Notary Public of the District of Columbia.
16
17
18
19
20
21
22

---

**Page 3**

1           A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        GREGORY L. LATTIMER, ESQUIRE
4        Law Offices of Gregory L. Lattimer
5        Suite 920
6        1100 H Street, Northwest
7        Washington, D. C.  20005
8        (202) 638-0095
9
10
11
12    ON BEHALF OF THE DEFENDANTS:
13        LETICIA L. VALDES, ESQUIRE
14        ZUBERI WILLIAMS, ESQUIRE
15        Office of the Attorney General
16        1 Judiciary Square
17        6th Floor South
18        441 4th Street, Northwest
19        Washington, D. C.  20001
20        (202) 727-3500
21
22        ALSO PRESENT:  Jerome Gray

---

**Page 4**

1           C O N T E N T S
2    EXAMINATION OF SERGEANT NACEL A. LAWRENCE    PAGE
3        BY MR. LATTIMER            5
4
5
6
7           E X H I B I T S
8        (Attached To Transcript)
9    DEPOSITION EXHIBIT            PAGE
10    1  D.C. Code Section 22-1321        59
11    2  Police Report        65
12
13
14
15
16
17
18
19
20
21
22

---

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

6 (Pages 21 to 24)

---

**21**

1  detail.
2  **A.  Could you be more specific?  Are you talking**
3  **about at RFK?**
4  Q.  Yes.
5  **A.  I believe twice.**
6  Q.  So you had performed as a supervisor at RFK
7  on two prior occasions?
8  **A.  At least one prior occasion.**
9  Q.  At least one prior occasion.
10  Okay.  And was that for a Nationals baseball
11  game or some other event?
12  **A.  Nationals baseball game.**
13  Q.  Now, do you recall what time your duties
14  began in that capacity on the -- what was it, 20th of
15  April, 2005?
16  MS. VALDES:  Objection as to form.
17  **A.  I don't know what time the detail actually**
18  **started.**
19  BY MR. LATTIMER:
20  Q.  Do you remember when your normal duty hours
21  were at that particular time?
22  MS. VALDES:  Objection as to form.

---

**22**

1  **A.  I believe I was assigned to the midnight tour**
2  **of duty, which would have been first watch, 2300 to**
3  **0700 hours.**
4  BY MR. LATTIMER:
5  Q.  So it would have been sometime other than
6  during that period, correct?
7  **A.  Right.**
8  Q.  So let's start off generally.  Why don't you
9  tell me what happened when you first encountered
10  Mr. Gray.  And when I say what happened, how did it
11  come about?
12  MS. VALDES:  Objection as to form.
13  **A.  Well, I approached two females, I don't know**
14  **their names at this time, to investigate whether or not**
15  **they were selling licensed Nationals merchandise.  That**
16  **was part of my role that day was to prevent illegal**
17  **vending.  At that time as I tried to engage them in**
18  **conversation, Mr. Gray came from the steps of the**
19  **armory and approached me and the two women and**
20  **interfered with my investigation.**
21  BY MR. LATTIMER:
22  Q.  Okay.  Let me get a little clarification.

---

**23**

1  Now, how did you know what the vendors could
2  or could not sell?
3  **A.  That's what I was attempting to investigate.**
4  Q.  But I'm trying to understand since I
5  understood it that you had not had any briefing or any
6  particular instruction prior to taking the assignment;
7  am I correct?
8  **A.  Well, to answer your question, I do know**
9  **through my experience that I have to check to see if a**
10  **person has a valid vending license.**
11  Q.  But my question was did I understand you
12  correctly that you had not had any briefing or any
13  instruction prior to going on the assignment?
14  **A.  Not specific.**
15  Q.  And I also thought I understood you to say
16  that the only training that you recall having was that
17  which was provided to you in your academy class of
18  87-5; am I correct?
19  **A.  To the best of my recollection, yes.**
20  Q.  And the Nationals didn't exist at that time,
21  '87, correct?
22  **A.  Correct.**

---

**24**

1  Q.  So what I'm trying to understand is how would
2  you have known what could or could not be sold by the
3  vendors at that location?
4  MS. VALDES:  I'm going to object as to
5  relevance, but you can go ahead and answer.
6  **A.  Well, I was aware that the licensed**
7  **merchandise had the official Major League Baseball**
8  **attachment to it.**
9  BY MR. LATTIMER:
10  Q.  Okay.  But again, that's not my question.  I
11  am not talking about what's licensed, what's not, what
12  Major League Baseball does, what they don't do.  What
13  I'm asking is how did you know what the vendors could
14  or could not sell at RFK?
15  MS. VALDES:  Objection, asked and answered.
16  You can go ahead and answer again.
17  **A.  Well, I was attempting to investigate that.**
18  BY MR. LATTIMER:
19  Q.  Okay.  But how do you investigate it if you
20  don't know what the rules allow is what I'm trying to
21  understand.
22  MS. VALDES:  Objection.  You're misstating

---

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

9 (Pages 33 to 36)

33

1    Q.   But we're not talking about H Street.  We're
2    talking about RFK.  But are you saying that everybody
3    on H Street has to have a blue tablecloth?
4    **A.   Have to be in compliance with vending regs.**
5    Q.   And vending regs requires that everybody on H
6    Street have a blue tablecloth?
7    **A.   To the best of my knowledge.**
8    Q.   Now, when did you become, again, accustomed
9    to vending regs?  Because I thought I understood you to
10   say, and maybe I misunderstood, but I thought I
11   understood you to say that the only time that you had
12   had any training regarding vending regs was in 1987.
13   **A.   Formal training, yes.**
14   Q.   Okay.  So what other training, informal
15   training did you have regarding vending regs?
16   **A.   I can't recall.**
17   Q.   But something led you to believe that people
18   were supposed to have blue tablecloths?
19   **A.   Yes.**
20   Q.   So every vendor in the city, as far as you
21   understood, had to have a blue tablecloth in order to
22   conduct vending operations?

34

1        MS. VALDES:  Objection as to relevance.
2    Go ahead.
3    **A.   A blue covering or tablecloth.**
4    **BY MR. LATTIMER:**
5    Q.   And if they did not have that, then they were
6    not in compliance with the vending regs; is that right?
7    **A.   That's what I believe.**
8    Q.   And that would be a basis for you to take
9    enforcement action; is that correct?
10   **A.   It would be a basis for me to start an**
11   **investigation.**
12   Q.   Of what?  Either they have it or they don't.
13   **A.   Right.**
14   Q.   And if they don't have it, what I'm asking is
15   would that be a basis for you to take enforcement
16   action as you believe?
17   **A.   It would be a basis for me to inquire if they**
18   **had a vending license.**
19   Q.   So if they don't have a tablecloth, then you
20   can inquire if they have a vending license?
21       MS. VALDES:  I'm going to object to that.  I
22   don't know that that's the only time that he can

35

1    inquire.
2        MR. LATTIMER:  Well, that's what I'm asking.
3    **BY MR. LATTIMER:**
4    Q.   Nothing that I'm saying is a statement.
5    Everything I'm saying to you is a question, so I'm
6    asking you.  I'm not telling you.  I don't know the
7    facts.  I'm trying to gather the facts from you.  You
8    understand that, right?
9    **A.   Yes.**
10   Q.   So when I ask you that, I'm asking you about
11   your understanding.  So is it your understanding that
12   if an individual -- if an individual does not have a
13   blue cloth, tablecloth, then that provides you with a
14   basis to inquire as to whether or not they have a
15   license?
16   **A.   Yes, I would approach an individual and ask**
17   **if they had a license.**
18   Q.   But in this case, did anybody have a blue
19   tablecloth, either of the two women?
20   **A.   I didn't get a chance to fully investigate.**
21   Q.   But you saw them, right?
22   **A.   Uh-huh.**

36

1    Q.   And if you saw them, did you see a blue
2    tablecloth on their vending, whatever they using for
3    their vending operations?
4        MS. VALDES:  Objection as to relevance.
5    **A.   I don't remember the exact setup.  I vaguely**
6    **remember a box.**
7    **BY MR. LATTIMER:**
8    Q.   So why did you arrest Mr. Gray?
9    **A.   He interfered with a police investigation.**
10   **His actions caused pedestrian flow from the Metro stop**
11   **at RFK from going into the stadium.**
12   Q.   But the Metro is a ways from the stadium,
13   isn't it?  The entrance to the Metro or the exit from
14   the Metro is a long -- quite a few feet from the
15   entrance to the stadium, isn't it?
16   **A.   Yeah, but you walk it.**
17   Q.   Where in relation to the Metro station were
18   these two women that you encountered?
19   **A.   40 yards.**
20   Q.   40 yards from the Metro station.  And
21   approximately how far was that from the entrance to
22   RFK?

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

12 (Pages 45 to 48)

**45**

1    Q.   Done? I thought she said you had more to
2  say. She asked you got anymore to say, and you said
3  yeah. I don't want to cut you off. Got more to say?
4         MS. VALDES: He says he's done.
5  BY MR. LATTIMER:
6    Q.   Okay. Now, like I said, I assume that if a
7  baseball game is going on, and people are going to the
8  baseball game, that there is a crowd walking to the
9  baseball game, okay?
10        MS. VALDES: Is there a question,
11  Mr. Lattimer?
12        MR. LATTIMER: Is that an objection?
13        MS. VALDES: Yes, it is.
14        MR. LATTIMER: Make your objections, but see,
15  I don't answer questions. Now, you got an objection,
16  make it, but I don't get to be questioned, okay?
17        MS. VALDES: That's fine.
18  BY MR. LATTIMER:
19    Q.   So I assume all of that's happening. What
20  I'm talking about, what I want to talk about with you
21  is when the crowd started gathering, and so my question
22  to you before we had all this colloquy was when

**46**

1  Mr. Gray approached, had a crowd started to gather
2  then, not when they were passing by, but had they
3  started to gather?
4    A.   I don't know.
5    Q.   Okay. So Mr. Gray approaches. Who says --
6  does he say something to you immediately or is there a
7  delay?
8         MS. VALDES: Objection, compound, and
9  objection as to form.
10        Go ahead.
11    A.   He told the women that they didn't have to
12  say anything to me.
13  BY MR. LATTIMER:
14    Q.   But had you asked them something?
15    A.   I attempted to.
16    Q.   So what was he talking about? If you hadn't
17  asked a question, what was he telling them they didn't
18  have to answer?
19        MS. VALDES: Objection. It calls for
20  speculation.
21        You can answer if you can.
22    A.   I remember him telling them that they didn't

**47**

1  have to say anything to me, that I didn't know what I
2  was talking about, and that he didn't have to leave.
3  BY MR. LATTIMER:
4    Q.   Who did he say that to, he didn't have to
5  leave?
6    A.   Me.
7    Q.   So he was talking to both you and the women?
8    A.   Yes.
9    Q.   So if I get it straight, you approached the
10  women to investigate, Mr. Gray simultaneously
11  approaches you or the women, where you were with the
12  women, and as you're attempting to conduct your
13  investigation, Mr. Gray then says to the women, you
14  don't have to talk to him, he don't know what he's
15  doing, and then he says to you what?
16        MS. VALDES: Objection. Mischaracterizes the
17  testimony of the witness. He said you don't know what
18  you're talking about, not you don't know what you're
19  doing.
20  BY MR. LATTIMER:
21    Q.   He says what to you?
22    A.   He didn't have to go anywhere.

**48**

1    Q.   Had you told him he had to go somewhere?
2    A.   Yes.
3    Q.   So we missed that part because what I asked
4  you was what happened, and you told me that he came up
5  and immediately started talking to the women and then
6  said something to you. So what had you said to him
7  prior to him telling you he didn't have to go anywhere?
8    A.   I believe I said, "Sir, I'm attempting to
9  talk to these women."
10    Q.   And then what happened?
11    A.   He refused to leave.
12    Q.   But what happened just before he said, "I
13  don't have to go nowhere"?
14    A.   He made the other statement that I didn't
15  know what I was talking about.
16    Q.   But had you said anything to him to suggest
17  that he had to leave prior to him saying, "I don't have
18  to leave"?
19    A.   After I said, to the best of my recollection,
20  "Sir, you need to leave," he said, "I don't have to go
21  anywhere."
22    Q.   But why did you tell him he had to leave or

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

13 (Pages 49 to 52)

---

**49**

1  you need to leave?
2  **A. Because I was trying to investigate and have**
3  **a dialogue with the two women who were vending.**
4  Q. But why do people have to leave if you're
5  trying to conduct an investigation?  What rule is that?
6  **A. Well, he was interfering with my**
7  **investigation.**
8  Q. Okay.  That's what I'm trying to understand.
9  So you told him you need to leave because he was
10  interfering?
11  **A. He was refusing to let me have dialogue with**
12  **the women.**
13  Q. And so that's why you told him he needs to
14  leave?
15  **A. Yes.**
16  Q. Now, what was the dialogue that you were
17  attempting to have with the women that he was
18  interfering with?
19  MS. VALDES:  Objection as to relevance, but
20  go ahead and answer.
21  **A. I was going to ask to see their vending**
22  **licenses, inquire as to what they were vending and were**

---

**50**

1  **they vending official merchandise.**
2  **BY MR. LATTIMER:**
3  Q. Official meaning Major League Baseball?
4  **A. Uh-huh.  Licensed.**
5  Q. Is that "yes"?
6  **A. Yes.**
7  Q. And we already talked about that part.
8  So had a crowd started to gather at that
9  point?
10  MS. VALDES:  At what point?  Which point are
11  we talking about now?
12  MR. LATTIMER:  You want to read back his
13  answer?
14  (The reporter read the record as follows:)
15  "ANSWER:  I was going to ask to see their
16  vending licenses, inquire as to what they
17  were vending and were they vending
18  official merchandise."
19  BY MR. LATTIMER:
20  Q. Now, you understand what point I'm talking
21  about?
22  **A. I noticed that traffic had slowed, pedestrian**

---

**51**

1  **traffic was slowing behind me.**
2  Q. And what was the significance of that?
3  **A. Part of my duties was to ensure the flow of**
4  **pedestrian traffic to the game.**
5  Q. But what is the significance of that with
6  regard to Mr. Gray?
7  **A. Mr. Gray's behavior was causing both**
8  **vehicular traffic and pedestrian traffic to slow.**
9  Q. How did Mr. Gray's behavior cause vehicular
10  traffic to slow?
11  **A. He became loud and boisterous.**
12  Q. And what, the people in the vehicles heard
13  him?
14  **A. No.  I believe that they saw the people**
15  **standing behind us trying to figure out what was going**
16  **on.**
17  Q. You assume?
18  **A. (Witness nods.)**
19  Q. Correct?
20  **A. You said I assume.**
21  Q. Well, you don't know.  I take it you didn't
22  ask nobody in a car why they were slowing down, right?

---

**52**

1  **A. No, I didn't ask anybody in a car why they**
2  **were slowing down.**
3  Q. And you haven't subsequently asked anybody
4  that was in any of those cars why did you slow down,
5  right?
6  MS. VALDES:  Objection, asked and answered.
7  **A. No.**
8  BY MR. LATTIMER:
9  Q. So if you don't know why they slowed down and
10  you're telling us why you think they slowed down, that
11  means you're assuming, doesn't it?
12  **A. No.**
13  Q. So then what are you basing it on if you
14  don't know?
15  **A. My job was to ensure that the traffic**
16  **flowed.**
17  Q. I'm not asking you about your job.  What I'm
18  asking you about right now is you told me that these
19  people slowed down for a particular reason.
20  **A. Yes.**
21  Q. And I'm just asking you whether you know
22  that, and you told me no.  So if you don't know it, but

---

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

14 (Pages 53 to 56)

53

1  you're saying it, would that suggest that you're
2  assuming it?
3      **A. No.**
4      MS. VALDES: Objection, asked and answered.
5  BY MR. LATTIMER:
6      Q. If you're not assuming it, then what are you
7  basing it on?
8      **A. My experience as a police officer.**
9      Q. So your experience as a police officer is
10 that if people see people standing on the sidewalk, and
11 they're driving a car, they slow down?
12     **A. My experience is that when people see a**
13 **police officer and a crowd begin to gather around the**
14 **police officer, they do rubberneck.**
15     Q. So let me go back to that. I specifically
16 asked you had a crowd began to gather, and you
17 responded that traffic had slowed down, so let's try
18 this again.
19         At that point had a crowd began to gather?
20     MS. VALDES: Objection as to form. At that
21 point?
22     MR. LATTIMER: We already read the question

54

1  back. You want to read it back again? We read the
2  question. We read the answer. Everybody knows what
3  point we're talking about.
4      MS. VALDES: Well, are you clear as to what
5  point he's talking about, Officer?
6      THE WITNESS: Yes.
7  BY MR. LATTIMER:
8      Q. So had a crowd began to gather or not? It's
9  a yes-or-no question.
10     **A. From my peripheral vision, a crowd had begun**
11 **to gather.**
12     Q. How many people?
13     **A. I can't say exactly how many.**
14     Q. And these people were gathering at the
15 location where you were talking to Mr. Gray; is that
16 right?
17     **A. Yes.**
18     Q. And so then what happened?
19     **A. I arrested Mr. Gray.**
20     Q. Why? Because a crowd began to gather?
21     **A. No.**
22     MS. VALDES: Objection.

55

1  BY MR. LATTIMER:
2      Q. Okay. Why?
3      **A. I asked Mr. Gray for some identification**
4  **because I was going to conduct a stop.**
5      Q. Of who?
6      **A. Of Mr. Gray.**
7      Q. For what?
8      **A. For interfering with my investigation or**
9  **attempting to start a dialogue with the two women.**
10     Q. You were going to investigate him because he
11 was attempting to have a dialogue?
12     MS. VALDES: No. Objection. You're
13 misstating the testimony of the witness. He said
14 because he was interfering with his investigation.
15 BY MR. LATTIMER:
16     Q. Let me try this one more time. Everything
17 that I say to you is a question. I don't state any
18 facts, okay? So notwithstanding this stuff about me
19 saying what you said, I'm asking you. So let's try
20 this one more time.
21         You were investigating him, you wanted to
22 investigate him because he started a dialogue?

56

1      **A. I felt I needed to identify him.**
2      Q. Why?
3      **A. Because of his behavior.**
4      Q. What was that?
5      **A. It was irrational, it was loud, and it was**
6  **boisterous, and I wanted to understand why he was so**
7  **interested in these two women and their vending.**
8      Q. Now, I haven't heard, you haven't mentioned
9  loud before, so let's go back, and maybe, you know, we
10 were going over this too fast because I haven't gotten
11 to that part.
12         So when we talked about him approaching and
13 he said to the women, "You don't have to talk to him,"
14 was he loud?
15     **A. Yes.**
16     Q. He said that in a loud manner?
17     **A. Yes.**
18     Q. And when he said to the women you don't know
19 what you're talking about, that was loud?
20     **A. It was loud enough for passer-by to hear.**
21     Q. How do you know that?
22     **A. Because it was loud.**

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

15 (Pages 57 to 60)

**Page 57**

1  Q.  But how do you know who heard what?
2  **A.  I don't know who heard what.**
3  Q.  Was he using profanity?
4  **A.  No.**
5  Q.  So he was loud?
6  **A.  Yes.**
7  Q.  And when you told him he needed to leave, and
8  he said, "I don't have to go anywhere," was he loud?
9  **A.  Yes.**
10  Q.  Was he using profanity?
11  **A.  No, not that I remember.**
12  Q.  So that was the loudness, that's when the
13  loudness began, correct?
14  **A.  Uh-huh.**
15  Q.  So at that point you wanted to investigate
16  him because he showed an interest in these women?
17  **A.  I wanted to identify him.**
18  Q.  Well, that's investigating, right?
19  **A.  Yes.**
20  Q.  And so you ask him for what?
21  **A.  Identification.**
22  Q.  And what happened then?

**Page 58**

1  **A.  He refused.**
2  Q.  What did he say?
3  **A.  "I don't have to tell you anything."**
4  Q.  Oh, he said that to you, "I don't have to
5  tell you anything"?
6  **A.  (Witness nods.)**
7  Q.  You have to say yes or no.
8  **A.  Yes.**
9  Q.  And then what happened?
10  **A.  "I know my rights."**
11  Q.  That's what he said?
12  **A.  Yes.**
13  Q.  And then what happened?
14  **A.  I stopped Mr. Gray and placed him under**
15  **arrest.**
16  Q.  So the arrest was for not producing ID?
17  **A.  The arrest was for disorderly conduct.**
18  Q.  Okay.  But you said that he was loud when he
19  said something to the women.  You said he was loud when
20  he said he didn't have to leave.  You said he was loud
21  when you asked him for ID, and you arrested him because
22  he didn't -- when he failed to give you ID?

**Page 59**

1  **A.  Yes.  He failed -- he was interfering with my**
2  **official duties, I believed that he was causing a**
3  **breach of the peace, and I arrested him.**
4  (Exhibit Number 1 was marked for
5  identification and was attached to the transcript.)
6  **BY MR. LATTIMER:**
7  Q.  Now, I have here a copy of the statute
8  involving the D.C. disorderly conduct, and I have
9  marked it as Defendant's 1, and I want to go over it
10  with you so you can go through and tell me what
11  specifically you're saying that he did, and that
12  says -- that's D.C. Code Section 22-1321.  You're
13  familiar with that, right?
14  **A.  Uh-huh.**
15  Q.  You have to say yes or no.
16  **A.  Yes.**
17  Q.  And it says, "Whoever with intent to provoke
18  a breach of the peace or under circumstances that such
19  a breach of the peace may be occasioned thereby," and
20  then it goes through five different bases.  Do you see
21  that?
22  **A.  Yes.**

**Page 60**

1  Q.  Now, tell me which ones that he engaged in.
2  One, two, three, four, five or all?
3  **A.  One and two.**
4  Q.  One and two.  Any others?
5  **A.  No.**
6  Q.  All right.  So one says, "Acts in such a
7  manner as to annoy, disturb, interfere with, obstruct
8  or be offensive to others."  Who did he do that to,
9  number one?  I'm talking about number one.  How did he
10  annoy, disturb, interfere, obstruct or be offensive to
11  someone else?
12  **A.  His actions prevented the free flow of**
13  **pedestrian traffic to the stadium from the armory.**
14  Q.  But what we're talking about now is one.
15  **A.  That's what I'm talking about.**
16  Q.  "Acts in such a manner as to annoy, disturb,
17  interfere with, obstruct or be offensive to others."
18  And you're saying that his actions obstructed people
19  from getting to the stadium.  That was the basis for
20  number one?
21  **A.  Yes.**
22  Q.  And that was -- he was 70 yards away from the

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

16 (Pages 61 to 64)

**61**

1  stadium, right?
2     **A.  I would say 70 yards.**
3     Q.  And then number two, "Congregates with others
4  on a public street and refuses to move on when ordered
5  by the police."  Who did he congregate with?
6     **A.  This is, "Refuses to move on when ordered by**
7  **the police."**
8     Q.  But you're not looking at number two.  Number
9  two says, "Congregates with others on a public street
10  and refuses to move on when ordered by the police."
11  And what I'm asking you is who did he congregate with?
12     **A.  No one.**
13     Q.  So that part that deals with congregating
14  with others on a public street, he didn't do that,
15  right?
16     **A.  No.**
17     Q.  Okay.  Anything else that he did to engage in
18  this disorderly conduct?
19     **A.  No.**
20     Q.  Now, this case was no-papered, right?
21        MS. VALDES:  Objection as to relevance, but
22  you can go ahead and answer.

**62**

1     **A.  I had no further dealing with the case after**
2  **that.**
3  **BY MR. LATTIMER:**
4     Q.  So you didn't go to court?
5     **A.  I wasn't CANS'd to go to court.**
6     Q.  Did you go paper the case?
7     **A.  No.**
8     Q.  Why?
9     **A.  Because I didn't have to.  I don't remember**
10  **why.**
11     Q.  Well, if you don't paper it, it doesn't get
12  filed, right?
13     **A.  I don't know the disposition of the case.**
14     Q.  Well, wait a minute.  You're the arresting
15  officer, right?  You have to say yes or no.
16     **A.  Yes.**
17     Q.  And as the arresting officer, the only way
18  any case gets filed is if you paper it, correct?
19     **A.  Correct.**
20     Q.  And they have a section in the U.S.
21  attorney's office solely that deals with papering,
22  correct?

**63**

1     **A.  Correct.**
2     Q.  So if you never go paper a case, no case can
3  get filed, can it?
4     **A.  Yes, cases can be filed.**
5     Q.  Without people papering them?
6     **A.  Yes.**
7     Q.  How does that happen?
8     **A.  It's called paperless papering.**
9     Q.  Paperless papering.  What crimes are those?
10     **A.  I believe that disorderly conduct is one of**
11  **those crimes.  I'm not exactly sure of all of the**
12  **crimes.**
13     Q.  So why didn't you paper this case?
14     **A.  I don't know.**
15        MS. VALDES:  Objection as to relevance.
16  BY MR. LATTIMER:
17     Q.  Well, when you went to the station, you had
18  to fill out paperwork, right?
19     **A.  Yes.**
20     Q.  And you did that?
21     **A.  Yes.**
22     Q.  Okay.  And then the following day, you're

**64**

1  supposed to go and paper the case, right?
2     **A.  There are a lot of factors involved.**
3     Q.  I understand that, but normally that's what
4  normally happens, correct?
5        MS. VALDES:  Objection as to form.
6        You can go ahead and answer.
7     **A.  There are a lot of factors involved.**
8  **BY MR. LATTIMER:**
9     Q.  What else?  Let's go through them.  What are
10  the factors involved?
11        MS. VALDES:  Objection as to relevance.
12        You can go ahead and answer.
13     **A.  The person may elect to forfeit, which means**
14  **pay a fine.  They may be released on citation or they**
15  **may go to court; whereas, the case will go to**
16  **disposition after they're arraigned in C10.**
17  **BY MR. LATTIMER:**
18     Q.  Or it can be papered?
19     **A.  Yes.**
20     Q.  And the officer has the ability to determine
21  whether a case is going to be papered or not, correct?
22  Or at least he can present it for papering.  The U.S.

DEPOSITION OF SERGEANT NACEL A. LAWRENCE
CONDUCTED ON THURSDAY, OCTOBER 18, 2007

17 (Pages 65 to 68)

---

**65**

1 attorney's office will have the final say, but an
2 officer can present it for papering, correct?
3   **A. Yes.**
4     MS. VALDES: Objection, compound.
5 BY MR. LATTIMER:
6   Q. You didn't present this for papering, did
7 you?
8   **A. No.**
9   Q. Why is that?
10   **A. I don't remember.**
11     MR. LATTIMER: I want to go over your report
12 with you so I can make sure that I'm clear. Let's take
13 a five-minute break.
14     (A brief recess was taken.)
15     (Exhibit Number 2 was marked for
16 identification and was attached to the transcript.)
17 BY MR. LATTIMER:
18   Q. I'm handing you what is marked as number 2,
19 which is a police report in this case. If you'll take
20 a moment to review it, let me know when you're done, I
21 want to ask you a few questions about that.
22   **A. Okay.**

---

**66**

1   Q. Now, does that have your signature on it?
2   **A. Yes.**
3   Q. The second page of Plaintiff's Exhibit 2?
4   **A. Yes.**
5   Q. And the second page is a narrative of what
6 you say happened; is that right?
7   **A. Yes.**
8   Q. Now, it says at approximately 1945. What
9 time was that?
10   **A. 1945?**
11   Q. Yes. What time is that in regular terms,
12 8:30? 9:30? 10:30?
13   **A. 7:45.**
14   Q. And the game started at what time?
15   **A. I'm not exactly sure the exact start, game**
16 **time.**
17   Q. Do you know what time they normally start?
18     MS. VALDES: Objection as to form.
19   **A. No.**
20 **BY MR. LATTIMER:**
21   Q. Had the game already started by this time?
22   **A. I'm not sure.**

---

**67**

1   Q. Now, in your report you indicated that the
2 woman approached you. Do you see that?
3   **A. Yes.**
4   Q. Is that accurate or is what you told me today
5 accurate, that you approached the women and asked them
6 a question?
7   **A. This woman was not the two women in question.**
8   Q. So that's not one of them, that was somebody
9 else?
10   **A. Yes.**
11   Q. So Mr. Gray interrupted your conversation
12 with that woman, too?
13   **A. No.**
14   Q. Well, in here you say, "The defendant
15 interrupted and stated the woman was free to sell the
16 disputed merchandise if she wished." Do you see that,
17 second paragraph?
18   **A. Yes.**
19   Q. So what, he interfered with this other woman,
20 too?
21   **A. No.**
22   Q. So if that wasn't one of the women that you

---

**68**

1 had approached, then who was she?
2     MS. VALDES: Objection as to relevance.
3   **A. There were several vendors, and I don't**
4 **remember, but if this is my statement, then this is the**
5 **most accurate account.**
6 **BY MR. LATTIMER:**
7   Q. Okay. But what I'm just trying to understand
8 now is you said you approached two women earlier,
9 that's what you told me, and now I'm asking you about
10 your report where you indicate a woman approached you,
11 correct?
12   **A. Uh-huh.**
13   Q. You got to say yes or no.
14   **A. Yes.**
15   Q. And then I asked you did -- is that -- here
16 you stated the woman approached you, and you told me
17 that that was not one of the two women that you had
18 approached.
19   **A. I'm not exactly sure which woman approached**
20 **me. It's possible that one of the -- that the woman**
21 **who approached me was one of the two women I initially**
22 **tried to -- that initially brought me into contact with**

---