UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF:

JEROME C. GRAY,

    Plaintiff,

v.                                C.A. No. 06-01265(TFH)

DISTRICT OF COLUMBIA,
et al.,

    Defendants.

                              Tuesday
                              October 23, 2007

                              Washington, D.C.

DEPOSITION OF:

                 **JEROME C. GRAY**

called for examination by counsel for the Defendants, pursuant to notice of deposition, in the Office of the Attorney General, Conference Room 6N106, 441 Forth Street, NW when were present on behalf of the respective parties:



**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

```
 1          A    No, ma'am.

 2          Q    When was the last time you were

 3   employed?

 4          A    1994.

 5          Q    And who were you employed with?

 6          A    Metropolitan Police Department as

 7   a sergeant.

 8          Q    And did you retire with the

 9   Metropolitan Police Department?

10          A    Yes, ma'am.  After 26 years.

11          Q    Did you work anywhere else before

12   working for the police department?

13          A    Yes, ma'am.

14          Q    What was your -- what were your

15   duties for the police department at the time

16   of your retirement?

17          A    I was a vendor coordinator for the

18   Metropolitan Police Department.

19          Q    And what is a vendor coordinator?

20          A    I was responsible for enforcing

21   the vending regulation throughout the District

22   of Columbia.  Any public space complain and I
```

```
 1      A    Then he asked me who I was.

 2      Q    Okay, and what did you tell him?

 3      A    I told him I was a citizen voicing

 4 my First Amendment right, freedom of speech.

 5      Q    Okay.  Did you identify yourself

 6 at any point as a retired police officer?

 7      A    No, ma'am.

 8      Q    Were you carrying a gun with you

 9 at that time?

10      A    Yes, ma'am.

11      Q    Did you tell this police officer,

12 at any time -- right in this moment that we're

13 in, that you had a gun with you?

14      A    No, ma'am.

15           MR. LATTIMER:  Objection as to

16 relevance and materiality.

17           MS. VALDES:  Okay, go ahead.

18           THE WITNESS:  No, ma'am.

19           BY MS. VALDES:

20      Q    Okay, so you told the police

21 officer that that was incorrect, were you

22 speaking to him in the same tone of voice that
```

1    you are speaking to me now?

2           A    Yes, ma'am.  I --

3           Q    You were not --

4           A    Yes, ma'am.

5           Q    Okay.  Then what happened?

6           A    Then he was say that this is
7    private property in front of the Armory, and
8    that you cannot sell that product there, you
9    have to go up on the other side, 18th Street,
10   to sell it.

11          Q    Okay, so he was telling you that
12   or he was telling Ms. Young that?

13          A    He was telling the people that
14   were in the group and I was one of the --

15          Q    Wait a minute.  The people that
16   were in the group, up until now you had only
17   told me that Ms. Young had gotten there.  Who
18   else was there?

19          A    Ms. Young was there, Ms. Brenda
20   Sayles, another vendor helper, I can't think
21   of her name, and a guy named Steve.  He helped
22   the vendors, too.  Four of them were there at

1    that time.

2        Q    When you say that Steve helps the
3    vendors, too, what do you mean?

4        A    Steve worked for one of the
5    vendors, like, you know, unloading the car and
6    things like that.

7        Q    When did they get there during the
8    conversation, because I thought up to this
9    point it was just you, Ms. Young, and the
10   police -- and Sergeant Lawrence?  When did the
11   rest of the group get there?

12       A    Within minutes.

13       Q    Okay, so how many people in total
14   were in the group, including you, and Sergeant
15   Lawrence, and Ms. Young?

16       A    I'd say approximately seven, three
17   police officers.

18       Q    Okay, who else was saying anything
19   in the group?  Was anybody else saying
20   anything?

21       A    There was one officer -- he asked
22   me if I was a vendor and I said no, I was not

1   A   That's correct.

2   Q   And I was asking you who was
3   saying anything at the time and I think you
4   were mentioning that there were some people
5   say stuff.  Do you remember who was saying
6   anything at the time?

7   A   Well, Sergeant Lawrence was saying
8   that, like I said before, that in front of the
9   Armory it was private property.

10   Q   Okay.

11   A   And that they could not sell that
12   merchandise in front of the Armory because it
13   was private property.  They had to go up on
14   the side, 18th Street and East Capitol, to
15   sell those items.

16   Q   Okay.

17   A   I said, "Sir, that's not correct."
18   These are licensed vendors and these are
19   licensed spaces.

20   Q   Okay, and the n he responded, he
21   asked you who you were and you said?

22   A   I said that I was a citizen

1   exercising my First Amendment right, freedom
2   of speech.
3       Q    And then what happened?
4       A    Then he told me I had to leave
5   this area, and I said, "Sir, I haven't
6   violated any laws, I'm just he voicing my
7   opinion."
8       Q    And then what happened?
9       A    And then, about that time Ms.
10  Sayles and Ms. Young left, and the
11  representatives from Consumer Regulatory
12  Affairs was probably a hundred feet down.
13  They went to get them because the officer said
14  that they had to leave the area.
15      Q    Okay.
16      A    And again, I just told the
17  sergeant, I said, "That is not correct."  At
18  no time did I raise my voice.  I was talking
19  to them very politely.  I gave them all the
20  respect in the world.
21      Q    Okay.  And then what happened?
22      A    And then I decided -- I was

1  leaning against the Jersey barricade with my
2  hand folded and I said to myself, this
3  sergeant is out of control. He does not know
4  the vending regulation. So I stood up from
5  the wall, looked the sergeant straight in the
6  eye, I said, "Sir, am I under arrest?"
7      Q    Okay, you said, "I just told
8  myself." Were you thinking that or did you
9  actually say that out loud?
10     A    I was thinking to myself.
11     Q    You were thinking that, okay.
12     A    Okay. That he was out of control
13 and that he does not know the vending
14 regulation.
15     Q    Okay.
16     A    And I stood up from the wall, and
17 I said, "Sir, am I under arrest?"
18     Q    And then what happened?
19     A    He didn't say anything.  I
20 proceeded to turn right to walk away from him,
21 because to this time I just know that this
22 sergeant was not, you know, correct about what

1   he was doing. I walked -- I turned away from

2   him after he didn't -- I gave him time. I

3   gave him a chance to answer. I looked him

4   dead in the eye, I said, "Sir, am I under

5   arrest?" He didn't say nothing.

6           I proceeded to my right to walk

7   away. He threw me against the Jersey

8   barricade, put the handcuffs on me. I didn't

9   resist, and the first thing he said out of his

10  mouth is that "Now I'll find out who you are."

11  I responded, I said, "Sir, why are you placing

12  me under arrest?" "You're interfering with

13  our investigation." And I said, "Sir, what

14  investigation?"

15      Q    How many times did Officer

16  Lawrence ask you to leave the area?

17      A    One time.

18      Q    Okay. And why did you not comply?

19      A    Because I did not do anything

20  wrong. I did not violate any laws or

21  regulations. I was in front of the Armory.

22  I was not in an area of high drug or high

1  crime.
2      Q    Okay.  Let me ask you a question.
3  You are a 26 year veteran of the police
4  department, you are now retired, but you
5  worked for the police department, you said, 26
6  years.  When you have a situation, an
7  investigation, and you ask a citizen to please
8  leave, what do you expect from them?
9      A    Well, number one, it was any
10 investigation --
11     Q    Mr. Gray --
12     A    -- in my opinion --
13     Q    Mr. Gray --
14          MR. LATTIMER:  You have to let him
15 finish his answer.
16          THE WITNESS:  -- in my opinion,
17 with my police experience, that was not an
18 investigation.
19          MS. VALDES:  Okay.  That's not
20 what I asked you, Mr. Gray, but thanks for
21 telling me that.
22          THE WITNESS:  Okay.