1

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

JEROME C. GRAY,                    :
                                   :
    Plaintiff,                     :
                                   :
                                   :C.A. No.
                                   :06-1265
                                   :(RWR)
    v.                             :
                                   :
THE DISTRICT OF COLUMBIA, et al.   :
                                   :
    Defendants.                    :
                                   :

---

Tuesday, November 20, 2007

DEPOSITION OF:

BRENDA SAYLES

called for examination by counsel for the defendants, pursuant to notice of deposition in the Office of the Attorney General for the District of Columbia, 441 4th Street, N.W., 6th Floor South, Washington, D.C., when were present on behalf of the respective parties:

PLAINTIFF'S EXHIBIT 2

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1  Q    Was it your understanding that if
2  he didn't sign this paper they were going to
3  keep him there?
4  A    Until whatever length of time -- I
5  guess they were trying to wear him down. So
6  they -- they clearly -- it started close to
7  around 5:30 in the afternoon. It was then
8  around 1:00 o'clock in the morning. And --
9  and -- and they were still trying to get him
10 to waive his rights.
11 Q    And these people that were trying
12 to get him to waive his rights, were these
13 police officers?
14 A    Police officers at 5 District.
15 Q    The police station you think was
16 on Benning Road. I think that's 6D.
17 A    Okay. 6th District.
18 Q    Okay. In your statement you
19 talked about Sergeant Lawrence seeming to be
20 incoherent or intoxicated. Could you tell us
21 exactly what you mean by that? What gave you
22 that impression?

1  A   Well, first of all, like I said
2  earlier, he was not answering the questions
3  that were being asked of him.
4      And then in his role as the lead
5  person for that particular assignment, it
6  seemed strange that he -- he really didn't
7  have many answers at all. He didn't really
8  know about this tag that he was telling people
9  that they had to go around and look -- look
10 for. When I asked him what kind of tag or --
11 or what the significance of the -- the --
12 deciding what the tag was about, or also
13 asking him about his authority to even tell
14 the vendors to pack up and leave, he was just
15 showing that he was more irritated about the
16 fact that I was asking these questions.
17     But I was standing as close to him
18 as I am to you.
19 Q   That's about three feet?
20 A   Yes.
21 Q   Okay.
22 A   And as I was talking to him, I

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C. 20005-3701      www.nealrgross.com

1  could smell alcohol on his breath. Okay?

2  Now my girl -- and I didn't say
3  anything about it. My girlfriend Ann Young is
4  the one that brought it up because I was -- at
5  first I was like, it seems like this guy has
6  been drinking. And because like I said, I
7  have a reaction to alcohol whenever I smell
8  it.

9  And -- and as soon as we were on
10  our way to the police precinct, she says that
11  guy had been drinking. And I said -- I looked
12  at her like -- you know -- both of us can't
13  just be coming up with the same conclusion --
14  you know -- out of the clear, blue sky. And
15  so I -- and so I just assumed that it must
16  have been true -- that he had been drinking,
17  because both of us were very close to him.

18  Q    Okay. Now, have you seen people
19  intoxicated before?

20  A    Plenty of them. Started with my
21  father.

22  Q    All right. Based upon your

1  experiences, did this guy appear to be
2  intoxicated?
3      A    He wasn't falling down drunk, but
4  he -- he had what people call a buzz.
5      Q    And you could tell that based upon
6  your observations of him?
7      A    Based upon my observation of him,
8  his eyes were red. He was talking kind of
9  like -- he was talking at you more so than he
10 was being responsive to your questions.
11          But the biggest thing was the odor
12 of his breath.
13     Q    Now you also talked about his
14 speech was noticeably slurred. How did you
15 detect that? What was that about?
16     A    Well, he wasn't really
17 articulating like I think -- when you talk to
18 a police officer, usually they're
19 straightforward, very authoritative, like they
20 really know what they're talking about. He
21 was almost like in a head scratch kind of
22 mode. And --

1   Q   Did he have a thick tongue or a
2   heavy tongue?
3   A   It wasn't bad. But it was --
4       MS. VALDES: Objections to form.
5       THE WITNESS: Pardon?
6       MS. VALDES: You can go ahead and
7   answer.
8       MR. LATTIMER: You can answer.
9       THE WITNESS: It wasn't bad, but
10  it was similar to somebody that would be in
11  the beginning stages of -- of -- of -- of
12  getting tipsy.
13      BY MR. LATTIMER:
14  Q   Now I'm going to take you back to
15  the station. You were there and you kept
16  asking about him -- Mr. Gray -- and what he
17  was charged with. Do you remember that?
18  A   Yes.
19  Q   Okay. And you said nobody would
20  tell you. Right?
21  A   Initially they wouldn't. Finally
22  someone said it was going to be disorderly

1   conduct.

2           But at first they were asking -- a
3   couple of them were asking each other what the
4   charge was.  And I think they were trying to
5   decide on the charge, because they even at one
6   point got on the phone to call somebody.  I
7   don't know who they were talking to, or
8   whether it would be a legal department or
9   whether it was some of their superiors, or
10  who.

11      Q   You just know they were calling
12  somebody?

13      A   Yes.

14      Q   Okay.  Now, when you mentioned
15  that in response to a question earlier, you
16  had a look of surprise that the charge was
17  disorderly conduct?

18      A   Exactly.

19          MS. VALDES:  Objection to form.

20          BY MR. LATTIMER:

21      Q   Why is that?

22      A   Because at no time was he

1  disorderly. He only -- the only thing he said
2  was in defense of the vendors that you are
3  wrong. You can't just make them leave.
4      Q  Right. Did you ever hear him
5  yelling?
6      A  He never yelled.
7      Q  Did he raise his voice?
8      A  He didn't -- he never raised his
9  voice.
10     Q  Did he act out?
11     A  He did not act out.
12     Q  Did he jump around?
13     A  No.
14     Q  Did he cause a scene?
15     A  As a matter of fact, he was
16 leaning on the wall at the time that -- as far
17 as I know -- when -- the last time I saw him,
18 he was leaning on the wall. The whole time he
19 was talking to Sergeant Lawrence, he was
20 leaning on the wall. When Ann and I turned
21 around and came back with Mr. Wise, he was
22 still leaning on the wall. So he never left

| | |
|---|---|
| 1 | the position where he was on the wall. |
| 2 | Q   Now, I understand there was a time |
| 3 | where you and Ms. Young walked away.  Right? |
| 4 | A    Yes. |
| 5 | Q    All right.  When you all walked |
| 6 | away and you couldn't see what was happening |
| 7 | with Mr. Gray and Sergeant Lawrence, did you |
| 8 | ever hear yelling? |
| 9 | A    Never was any yelling. |
| 10 | Q    Screaming? |
| 11 | A    No screaming. |
| 12 | Q    Shouting? |
| 13 | A    No shouting. |
| 14 | Q    Obscenities? |
| 15 | A    No obscenities. |
| 16 | Q    Okay.  Now you indicated that |
| 17 | there were a lot of vendors around.  Right? |
| 18 | A    Yes. |
| 19 | Q    And you also indicated people were |
| 20 | walking by? |
| 21 | A    Yes. |
| 22 | Q    Did any of those people ever stop |

1  to see what was going on?

2      A    Well the vendors stopped.

3      Q    No, I mean the other people.

4      A    The other people -- they -- they
5  looked over there. Any time you see a lot of
6  police officers around, you tend to kind of
7  look and to see what you can see. But you're
8  still kind of walking along your path.

9      Q    So everybody in the traffic kept
10 flowing?

11     A    Yes.

12     Q    People weren't stopping to deal
13 with this situation?

14     A    Other than the vendors, no.

15     Q    And the vendors were there from
16 when? When did the vendors first show up?

17     A    They started showing up when we
18 first started talking to the female police
19 officers, because they wanted to know what
20 their situation was going to be just like Ann
21 Young wanted to know what her situation was
22 going to be. So they were trying to get

1  firsthand information, I assume, because after
2  all, we were the ones that had called the
3  police officers over to us to get
4  clarification. They didn't --
5    Q  Those vendors came over and
6  started gathering before or after Mr. Gray
7  said anything to Sergeant Lawrence?
8    A  They came before.
9    Q  They were already there?
10    A  They came when the female officers
11  -- when we were first initially asking the
12  female officers what -- for clarification
13  about these tags they were asking about.
14    Q  Okay. Now did you ever mention to
15  anybody that you had some questions about
16  Sergeant Lawrence's sobriety?
17    A  Yes. I mentioned it to the
18  commander there at the station.
19    Q  Who? Which one?
20    A  At the 6th District.
21    Q  Do you remember which commander?
22    A  The one that was in charge of the

1  6th District.

2  Q   Was it Chase?

3  A   Yes.

4  Q   Okay. What did you say to
5  Lieutenant Chase?

6  A   I told him -- well, both Ms. Young
7  and I was standing side by side. And we both
8  told him that we smelled alcohol on Sergeant
9  Lawrence's breath.

10  Q   And what if anything did he do or
11  say?

12  A   He just said he would look into
13  it.

14  Q   And to your knowledge, did he ever
15  do anything?

16     MS. VALDES:  Objection.

17     THE WITNESS:  I never found out
18  what happened.

19     BY MR. LATTIMER:

20  Q   He never got back to you regarding
21  that?

22  A   No.

Case 1:06-cv-01265-TFH   Document 28-3   Filed 05/04/2008   Page 13 of 14

124

1   Q   Did you ever see him go and talk
2   to Sergeant Lawrence?
3   A   No. Because he was on his way --
4   when he -- when he -- he came out to the
5   waiting area where Ms. Lawrence -- I mean, Ms.
6   Young and I were sitting. And apparently past
7   the waiting area is the route that he takes to
8   go to his own office. So he was going to
9   speak to us. And he said that he had to go to
10  his office to take care of another matter, and
11  that he would get back to us. But he -- he
12  did not get back to us.
13  Q   So he never told you whether or
14  not he himself investigated and determined
15  that --
16  A   No, he did not.
17  Q   Let me finish.
18  A   I'm sorry.
19  Q   -- that Lawrence had or did not
20  have alcohol on his breath?
21  A   He never told us one way or the
22  other.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C. 20005-3701      www.nealrgross.com

1    Q    And he never indicated to you
2  whether or not he had Lawrence take a
3  Breathalyzer?
4    A    No. But we asked if he would have
5  him take one.
6    Q    And what did he say in response to
7  that?
8    A    He just told us he would -- he
9  would get back to us. He -- he never said
10 whether he was or he wasn't.
11   Q    Was Sergeant Lawrence driving a
12 vehicle?
13   A    As far as I know he was.
14   Q    And you asked the commander for
15 him to take a Breathalyzer?
16   A    I did.
17        MR. LATTIMER: Okay. I think I
18 have nothing else.
19        MS. VALDES: I have a couple of
20 questions, Ms. Sayles, for you.
21            REDIRECT EXAMINATION
22        BY MS. VALDES: